UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>EDMON JOHN ISHO,<br><br>Defendant. | No. 1:15-cr-00103-DAD-BAM<br><br>ORDER DENYING DEFENDANT'S EMERGENCY MOTION FOR MODIFICATION OF SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)<br><br>(Doc. No. 37, 40, 42) |

Pending before the court is defendant Edmon John Isho's motion for a reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). (Doc. Nos. 37, 42.) The motion is based in part on the purported risks posed to defendant Isho by the ongoing coronavirus ("COVID-19") pandemic. For the reasons explained below, defendant's motion will be denied.

**BACKGROUND**

On January 14, 2016, a superseding indictment was returned charging defendant Isho in Count One with possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1) and in Counts Two, Three and Four with distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) – (C). (Doc. No. 20.) On January 17, 2017, defendant entered a plea of guilty to Counts One and Two, which carried with them maximum punishments of ten years and twenty years in prison, respectively. (Doc. Nos. 32; 34 at 18.) On May 1, 2017, the court sentenced defendant Isho to 120 months in the custody of the U.S. Bureau

of Prisons ("BOP") on both counts, with those terms to be served concurrently and to be followed by concurrent terms of supervised release of 60 months. (Doc. Nos. 35, 36.) The court also imposed special assessments in the amount of $200.00. (Doc. No. 36.) Defendant is now serving his sentence at the Federal Correctional Institution, Fort Dix Complex ("FCI Fort Dix") in New Jersey. (*See* Doc. No. 42 at 6.) As of the date of this order, defendant Isho has served approximately 82 months of his 120-month prison sentence with good time credits. (*See* Doc. No. 44-1, Ex. 1.)

Defendant filed the pending motion on May 19, 2020, and a supplement to that motion on August 7, 2020. (Doc. Nos. 37, 42.)[1] On August 10, 2020, the government filed its opposition to the motion, and on October 12, 2020, defendant filed his reply thereto. (Doc. Nos. 44, 57.) On November 19, 2020, defendant's counsel filed a supplemental brief in support of the pending motion. (Doc. No. 63.)

## LEGAL STANDARD

A court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see also Dillon v. United States*, 560 U.S. 817, 824 (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances."). Those limited circumstances include compassionate release in extraordinary cases. *See United States v. Holden*, 3:13-cr-00444-BR, 2020 WL 1673440, at *2 (D. Or. April 6, 2020). Prior to the enactment of the First Step Act of 2018 ("the FSA"), motions for compassionate release could only be filed by the BOP. 18 U.S.C. § 3582(c)(1)(A) (2002). Under the FSA, however, imprisoned defendants may now bring their own motions for compassionate release in the district court. 18 U.S.C. § 3582(c)(1)(A) (2018). In this regard, the FSA specifically provides that a court may

> upon motion of the defendant after the defendant has fully exhausted
> all administrative rights to appeal a failure of the [BOP] to bring a

---

[1] Defendant originally filed a supplement to the pending motion on July 10, 2020. (Doc. No. 40.) On August 7, 2020, defense counsel submitted a notice of *errata* in which he stated that the July 10, 2020 filing contained personal information that should not appear on the public docket. (Doc. No. 41.) Defense counsel filed a superseding and redacted supplement along with the notice of *errata* (Doc. No. 42), and the court ordered that the July 10, 2020 filing be sealed (Doc. No. 43).

>motion on the defendant's behalf[2] or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that –
>
> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission [.]

18 U.S.C. § 3582(c)(1)(A)(i) and (ii).[3]

---

[2] If the BOP denies a defendant's request within 30 days of receipt of such a request, the defendant must appeal that denial to the BOP's "Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). If the regional director denies a defendant's administrative appeal, the defendant must appeal again to the BOP's "General Counsel within 30 calendar days of the date the Regional Director signed." *Id.* "Appeal to the General Counsel is the final administrative appeal." *Id.* When the final administrative appeal is resolved, a defendant has "fully exhausted all administrative rights." *See* 18 U.S.C. § 3582(c)(1)(A).

[3] Under 18 U.S.C. § 3624(c)(2), the BOP may release an incarcerated defendant to home confinement "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." The Coronavirus Aid, Relief, and Economic Security Act ("the CARES Act"), Pub. L. 116-136, expands the BOP's authority to release incarcerated defendants without judicial intervention. The CARES Act allows the BOP to "lengthen the maximum amount of time" for which a prisoner may be placed in home confinement under § 3624(c)(2) "as the Director determines appropriate," assuming "the Attorney General finds that emergency conditions will materially affect the functioning" of the BOP. CARES Act, Pub. L. 116-136, Div. B, Title II, § 12003(b)(2) (2020). However, the BOP's authority in this regard is limited to "the covered emergency period." *Id.* The BOP's authority expires "30 days after the date on which the national emergency declaration terminates." *Id.* § 12003(a)(2). After the CARES Act was enacted, the Attorney General issued a memo instructing the BOP to "immediately review all inmates who have COVID-19 risk factors" beginning with those who are housed at facilities where "COVID-19 is materially affecting operations." Office of Att'y Gen., *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19* (Apr. 3, 2020). The BOP has acted on the Attorney General's guidance, including one case in which a sentenced prisoner was

The applicable policy statement with respect to compassionate release in the U.S. Sentencing Guidelines sets out criteria and circumstances describing "extraordinary and compelling reasons." U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13[4]; *see also United States v. Gonzalez*, No. 2:18-cr-00232-TOR, 2020 WL 1536155, at *2 (E.D. Wash. Mar. 31, 2020) (noting that courts "universally" rely on U.S.S.G. § 1B1.13 to define "extraordinary and compelling reasons," even though that policy statement was issued before Congress passed the FSA and authorized defendants to file compassionate release motions). However, a large and growing number of district courts across the country have concluded that because the Sentencing Commission has not amended the Guidelines since the enactment of the FSA, courts are not limited by the pre-FSA categories described in U.S.S.G. § 1B1.13 in assessing whether extraordinary and compelling circumstances are presented justifying a reduction of sentence under 18 U.S.C. § 3582(c). *See, e.g.*, *United States v. Parker*, 461 F. Supp. 3d 966, 978–79 (C.D. Cal. 2020) (collecting cases); *United States v. Rodriguez*, 424 F. Supp. 3d 674, 681 (N.D. Cal. 2019).

In the past, when moving for relief under 18 U.S.C. § 3582(c), it was recognized that the defendant bore the initial burden of demonstrating that a sentence reduction was warranted. *See United States v. Sprague*, 135 F.3d 1301, 1306–07 (9th Cir. 1998). Although the Ninth Circuit has not specifically addressed the question of which party bears the burden in the context of a motion for compassionate brought pursuant to § 3582(c) as amended by the FSA, district courts to have done so have agreed that the burden remains with the defendant. *See, e.g.*, *United States*

---

released to home confinement after serving less than half his sentence from a facility that reported no positive COVID-19 cases at the time of his release. *See* Hannah Albarazi, *Paul Manafort Seeks Prison Release Over COVID-19 Fears*, LAW360 (Apr. 14, 2020), https://www.law360.com/articles/1263706/paul-manafort-seeks-prison-release-over-covid-19-fears (noting that the prisoner's counsel had argued that the CARES Act "broadens the authority" of the BOP to release prisoners to home confinement); Khorri Atkinson, *Paul Manafort Released From Prison Amid COVID-19 Fears*, LAW360 (May 13, 2020), https://www.law360.com/articles/1273090/paul-manafort-released-from-prison-amid-covid-19-fears.

[4] The Sentencing Guidelines also require that to be granted a reduction of sentence under 18 U.S.C. § 3582(c)(1)(A), the defendant must not pose "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

4

*v. Greenhut*, No. 2:18-cr-00048-CAS, 2020 WL 509385, *1 (C.D. Cal. Jan. 31, 2020); *United States v. Van Sickle*, No. 18-cr-0250-JLR, 2020 WL 2219496, *3 (W.D. Wash. May 7, 2020).

## ANALYSIS

As district courts have summarized, in analyzing whether a defendant is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), the court must determine whether a defendant has satisfied three requirements:

> First, as a threshold matter, the statute requires defendants to exhaust administrative remedies. 18 U.S.C. § 3582(c)(1)(A). Second, a district court may grant compassionate release only if "extraordinary and compelling reasons warrant such a reduction" and "that such reduction is consistent with applicable policy statements issued by the Sentencing Commission. *Id*. Third, the district court must also consider "the factors set forth in Section 3553(a) to the extent that they are applicable." *Id*.

*Rodriguez*, 424 F. Supp. 3d at 680; *see also United States v. Ramirez-Suarez*, 16-cr-00124-LHK-4, 2020 WL 3869181, at *2 (N.D. Cal. July 9, 2020); *Parker*, 461 F. Supp. 3d at 973–74; *United States v. Trent*, No. 16-cr-00178-CRB-1, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020) (noting that as to the third factor, under 18 U.S.C. § 3582(c)(1)(A) release must be "consistent with" the sentencing factors set forth in §3553(a)).

**A.    Administrative Exhaustion**

Defendant asserts, and the government does not dispute, that he exhausted his administrative remedies prior to filing the pending motion for relief under § 3582. Defendant Isho represents that on April 15, 2020, he submitted a request for compassionate release to the Warden of FCI Fort Dix. (Doc. No. 42 at 10) (citing *id.*, Ex. 2). Defendant filed the pending motion on May 19, 2020. (Doc. No. 37.) On June 3, 2020, and again on June 11, 2020, defendant's request submitted to the Warden was denied. (Doc. No. 42) (citing *id.*, Ex. 3). Defendant has not presented any evidence or argument suggesting that he pursued an administrative appeal from the warden's denial of his request to the BOP's Regional Director. *See* fn. 2, above. However, the Warden's denial was issued more than 30 days after defendant's request was submitted. Moreover, because failure to exhaust is normally viewed as an affirmative defense, the court will accept the government's concession and turn to address the

5

merits of defendant's pending motion below.

**B.      Extraordinary and Compelling Reasons**

According to the Sentencing Commission's policy statement, "extraordinary and compelling reasons" warranting compassionate release may exist based on a defendant's medical conditions, age and other related factors, family circumstances, or "other reasons." U.S.S.G. § 1B1.13, cmt. n.1 (A)–(D). Even though the catch-all of "other reasons" was included in the policy statement at a time when only the BOP could bring a compassionate release motion, courts have agreed that it may be relied upon by defendants bringing their own motions for reductions in their sentence under the FSA. *See, e.g.*, *United States v. Kesoyan*, No. 2:15-cr-00236-JAM, 2020 WL 2039028, at *3–4 (E.D. Cal. Apr. 28, 2020) (collecting cases).

The medical condition of a defendant may warrant the granting of compassionate release by the court where the defendant "is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," though "[a] specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required." U.S.S.G. § 1B1.13, cmt. n.1(A)(i). Non-exhaustive examples of terminal illnesses that may warrant a compassionate release "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id*. In addition to terminal illnesses, a defendant's debilitating physical or mental condition may warrant compassionate release, including when:

> The defendant is
>
> (I)   suffering from a serious physical or medical condition,
>
> (II)  suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

*Id*. at cmt. n.1(A)(ii). Where a defendant has moderate medical issues that otherwise might not be sufficient to warrant compassionate release under ordinary circumstances, many courts have concluded that the risks posed by COVID-19 may tip the scale in favor of release when the

particular circumstances of a case are considered in their totality. *See, e.g.*, *Parker*, 461 F. Supp.3d at 980 ("Since the onset of the COVID-19 pandemic, courts have determined that inmates suffering from conditions such as hypertension and diabetes are now at an even greater risk of deteriorating health, presenting 'extraordinary and compelling' circumstances that may justify compassionate release.") (collecting cases); *United States v. Rodriguez*, No. 2:03-cr-00271-AB, 2020 WL 1627331, at *10–11 (E.D. Pa. Apr. 1, 2020) ("Without the COVID-19 pandemic—an undeniably extraordinary event—Mr. Rodriguez's health problems, proximity to his release date, and rehabilitation would not present extraordinary and compelling reasons to reduce his sentence. But taken together, they warrant reducing his sentence.").

Compassionate release may also be warranted based on a defendant's age and other related factors. Thus, "extraordinary and compelling reasons" exist where a "defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less." U.S.S.G. § 1B1.13, cmt. n.1(B).[5]

Defendant Isho argues that extraordinary and compelling reasons warranting his compassionate release exist because he is at high risk of suffering a severe illness were he to contract COVID-19 due to multiple comorbidities. (Doc. No. 42 at 15.) In this regard, defendant contends that he suffers from hypertension, anxiety, and depression, and that courts have recognized the latter two conditions "as a significant health risk that can weaken the immune system" rendering people "more vulnerable to being infected by the COVID-19." (*Id.* at 15–18) (citing cases). When defendant Isho completed his authorization for release of medical information, financial affidavit, certification of identity, and release plan questionnaire and sent it along with his motion for compassionate release to the Federal Defender's Office, he also identified decreased lung capacity, lung collapse, obesity, pneumonia, and sleep apnea as health conditions from which he suffers. (*Id.* at 10.) Defendant also contends that there are now two

---

[5] This provision, however, does not apply here. As noted above, defendant Isho has now served approximately 82 months of his 120-month prison sentence with good time credits being accounted for in that estimate. Moreover, defendant is only 30 years old, and thus his age and age-related factors do not play a role in consideration of his pending motion. (Doc. No. 34 at 2.)

strains of COVID-19 spreading in the United States, and the newest strain spreads infection quicker and more easily, thereby placing him at very high risk of suffering severe illness from the virus. (*Id.* at 15.)

In opposition to the motion, the government asserts that neither defendant Isho's medical records nor the presentence report prepared in his case support the conclusion that he suffers from medical conditions other than obesity. (Doc. No. 44 at 5) (citing Doc. No. 48 at 4, 17). Moreover, the government notes that even among the health conditions from which defendant alleges he suffers, only obesity is among the medical condition that the Centers for Disease Control and Prevention ("CDC") recognizes as increasing one's risk of suffering severe illness from COVID-19. (*Id.* at 9.) The government adds that in 2019, defendant Isho's body mass index ("BMI") was 30.8, "only 0.8 over [the] figure that places him in a high-risk category." (*Id.* at 10.) According to the government, defendant could receive diet counseling in prison and could lessen his risk of suffering complication if infected with the virus merely by adjusting his diet and exercise. (*Id.*) Lastly, the government avers that it was unable to find a case in which obesity alone was found sufficient to warrant the granting of compassionate release, and that district courts have uniformly denied such motions brought by similarly situated defendants. (*Id.* at 10–12) (citing cases).

In reply, defendant argues that courts have granted compassionate release even where defendants were merely overweight, and not obese. (Doc. No. 57 at 7.) Moreover, defendant asserts that his medical records reflect that he suffers from hypertension, noting that "[t]he CDC defines stage I hypertension as a systolic blood pressure between 130 and 139 mm Hg or a diastolic blood pressure between 80 and 89 mm Hg," and that his blood pressure readings were within these ranges in June and September 2019. (*Id.*; *see also* Doc. No. 60 at 12.) He also points out that the Warden of FCI Fort Dix acknowledged in his June 2020 response to defendant's request for compassionate release that defendant suffers from hypertension. (Doc. No. 57 at 7) (citing Doc. No. 42 at 33 ("A review of your current medical status reveals that you are . . . diagnosed with hypertension . . .")). Additionally, attached to defendant's reply brief are medical records from Sutter Health confirming that in June 2012, he suffered a "gunshot wound

8

of chest with complication," "a traumatic pneumohemothorax with open wound into thorax," and an "open fracture of thoracic vertebra." (*Id.* at 8) (citing Doc. No. 61 at 2). As a result of that injury, defendant now argues that he suffers from respiratory problems and has been prescribed albuterol to treat bronchospasms. (*Id.*; *see also* Doc. No. 61 at 6.) Moreover, defendant asserts that his history of smoking puts him at an increased risk from COVID-19. (Doc. No. 57 at 8.) Lastly, defendant argues that he is unable to adequately provide self-care to protect himself from the COVID-19 pandemic while imprisoned. (*Id.* at 10.) In this regard, defendant contends that "[p]rison is not a place where one can easily 'adjust their diet and exercise,'" since his food selection is imposed upon him, and exercising is challenging, if not impossible. (*Id.*) He argues that inmates are no longer prohibited from exercising outside as they were during the first few months of the COVID-19 pandemic due to lockdowns, but that participation in group sports or use of gym equipment remain prohibited at his institution of confinement. (*Id.*) Defendant also observes that no amount of healthy living will remedy his conditions stemming from his past gunshot wound to the chest and history of smoking. (*Id.* at 11.)

As an initial matter, in the context of defendant's risk of suffering severe illness were he to contract COVID-19, the CDC recognizes defendant's body mass index of over 30 and his history of smoking as increasing that risk. *See People with Certain Medical Conditions*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated December 1, 2020). The CDC also recognizes hypertension as potentially increasing defendant Isho's risk of suffering severe illness if he contracts the virus. *Id.* The court notes that several of defendant's medical conditions are, in fact, apparently being adequately treated at FCI Fort Dix. *See United States v. Gorai*, No. 2:18-cr-00220-JCM, 2020 WL 1975372, at *3 (D. Nev. April 24, 2020) (concluding that the defendant could not provide self-care while incarcerated in part because defendant "ha[d] not received breathing treatments to clear his lungs, despite repeated requests"); *United States v. Weidenhamer*, No. 16-cr-01072-PHX-ROS, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8, 2019) ("Chronic conditions that can be managed in prison are not a sufficient basis for compassionate release."). For example, defendant acknowledges that he has been prescribed albuterol to manage

9

any respiratory issues from which he suffers, including those stemming from his past gunshot wound and history of smoking. (*See* Doc. No. 61 at 6.) Additionally, assuming *arguendo* that his anxiety and depression constitute serious medical conditions for purposes of this analysis, defendant acknowledges that both of those conditions are also being treated by BOP medical staff with medication. (*See* Doc. Nos. 57 at 9–10; 61 at 465.) With respect to his other alleged medical conditions, defendant has not argued that he has sought and been unable to receive medical attention to provide self-care.

The court also acknowledges, however, that the sheer number of positive COVID-19 cases at FCI Fort Dix impacts defendant Isho's ability to provide self-care. It has been recognized by some courts that "the presence of COVID 19 . . . necessitates a more expansive interpretation of what self-care means" and that an inability of individuals at high risk of becoming severely ill from COVID-19 to practice appropriate hygiene, wear a mask and maintain social distancing may constitute an inability to provide self-care. *See Gorai*, 2020 WL 1975372, at *3 (citation omitted). Regarding FCI Fort Dix specifically, some courts in the last month have found that the outbreak at that prison is severe enough to constitute an extraordinary and compelling reason by itself, let alone when considered in conjunction with a particular defendant's serious medical conditions. *See United States v. Davis*, No. CR TDC-15-0116, 2020 WL 6785351, at *2 (D. Md. Nov. 18, 2020) ("Although the presence of the historic COVID-19 pandemic in prisons arguably could alone establish extraordinary and compelling reasons, Davis has been incarcerated at FCI-Fort Dix, which [is] presently one of the hardest hit federal prisons."); *United States v. Mathis*, No. 02-CR-891 (ARR), 2020 WL 6784136, at *2 (E.D.N.Y. Nov. 18, 2020) (declining to find extraordinary and compelling reasons, though "troubled by the BOP's 'failure . . . to prevent and control a COVID-19 outbreak at FCI Fort Dix," because the defendant who lacked serious medical conditions failed to "provide[] any reasons why his 'risk is exceptional, when compared to the general prison population' at this facility"); *United States v. Collier*, No. 2:14-CR-00051, 2020 WL 6682655, at *2 (W.D. Pa. Nov. 12, 2020) (noting that defendant's type 2 diabetes and obesity, paired with the "actual, non-speculative risk of COVID-19 exposure at FCI Fort Dix," constituted an extraordinary and compelling reason); *United States*

*v. Elliott*, No. 3:17-CR-00051 (PGS), 2020 WL 6874869, at *2 (D.N.J. Nov. 23, 2020) (granting compassionate release "when considering together . . the short portion of [defendant's] sentence remaining to be served, [] the present outbreak of cases at Fort Dix," and defendant's asthma and obesity).

Indeed, the situation at FCI Fort Dix appears to have worsened significantly since defendant Isho filed the pending motion. When defendant filed his motion on June 2, 2020, 42 inmates and 5 staff at FCI Fort Dix had tested positive for the virus. (Doc. No. 42 at 6.) When the government filed its opposition on August 10, it reported that only one staff member was confirmed as having an active case of COVID-19 infection. (Doc. No. 44 at 6.) However, in his reply brief, defendant stated that as of October 10, 2020, "the facility reported 106 inmates with a positive COVID-19 test, an increase of 27 positive tests from the prior ten days." (Doc. No. 57 at 5.) In the recently filed supplemental brief, defendant's counsel contends that the COVID-19 outbreak at FCI Fort Dix has grown even more alarming, with 238 inmates and 18 staff members being reported as having the virus, and observing that the facility had been recognized by courts as suffering with the worst outbreak in of any BOP facility in the nation. (Doc. No. 63 at 2–3.) Fortunately, as of December 8, 2020, it appears that the situation at Fort Dix is improving somewhat with the BOP reporting that as of that date 103 prisoners and 36 staff members at that prison are confirmed as having active cases of COVID-19 and that no deaths have been reported there as a result of the outbreak.[6] *See* https://www.bop.gov/coronavirus/ (last reviewed December

---

[6] The undersigned does not accept these reported numbers at face value given the manner in which the CDC guidelines apparently allow for individuals to be counted as "recovered" from the virus without confirming test results. Other judges have recently expressed similar concerns regarding reporting of the COVID-19 outbreak at FCI Fort Dix. (*See* Doc. No. 62-1 at 7) (citing *United States v. Fernandez*, 12-CR-844-9 (AJN (S.D.N.Y Oct. 14, 2020) (not published) (granting compassionate release after denying it four months earlier, while noting that "the Court also has concerns that the reported numbers on the BOP website may not reflect the true scope of the outbreak at FCI Fort Dix."); *United States v. Weikel*, No. 16-20659, 2020 WL 6701914, at *2 (E.D. Mich. Nov. 13, 2020) (granting motion for compassionate release to a sentence of time served based upon conditions stemming from the pandemic and noting the growing numbers of infected prisoners and staff at Fort Dix and that "the outbreak may be even worse than is apparent from these numbers, as fewer than half of Fort Dix's inmates have received tests."); *Brown*, 2020 WL 5801494, at *2 (E.D. Pa. Sept. 29, 2020) ("However, the large population at Fort Dix, along with the lack of testing at the facility, may fail to accurately portray the crisis at the prison.")

2, 2020).

The court has conflicting and outdated evidence before it on the social distancing and quarantine practices at FCI Fort Dix. For example, defendant's declaration submitted on August 7, 2020 states that: it is impossible for prisoners to maintain social distancing at FCI Fort Dix, the bathrooms are filthy, there is insufficient soap, and there is no air conditioning. (Doc. No. 42, Ex. 1.) However, defendant has also attached to his reply brief the May 18, 2020 declaration of Dr. Nicoletta Turner Foster, the Clinical Director at FCI Fort Dix. (Doc. No. 57-4 at ¶ 1.) Therein, Dr. Foster declares that FCI Fort Dix

> has taken a number of measures in response to the COVID-19 pandemic, including providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with Bureau policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other preventative measures.

(*Id.* at ¶ 16.) In that declaration, Dr. Foster also describes the several social distancing measures that have been put in place at FCI Fort Dix and further states that all inmates and staff at that prison are provided cloth and surgical masks, which are mandatory and have been provided on a weekly basis. (*Id.* at ¶¶ 22, 24.) Although the court has not received any more recent update on the status of social distancing measures at FCI Fort Dix following receipt of these two declarations, the number of positive COVID-19 cases is some reflection of the effectiveness of the BOP's measures.

Given the uniquely dire situation at FCI Fort Dix, the court finds that defendant Isho's ability to provide self-care for his medical conditions is diminished by the COVID-19 outbreak there. In light of all the above, the court concludes that defendant Isho's medical conditions and presence of COVID-19 at FCI Fort Dix, together, support a finding of extraordinary and compelling reasons warranting a reduction of his sentence. *See Davis*, 2020 WL 6785351, at *2

---

Defendant observes that these numbers reported by the BOP are confusing and avers that they "surely understate the state of the crisis." (Doc. No. 57 at 11.) Nonetheless, and despite these very legitimate concerns, there is also no evidence before the court contradicting the already alarming numbers of active COVID-19 cases currently being reported by the BOP at FCI Fort Dix.

12

("Thus, COVID-19 presents a significant threat to the health and safety of Davis and the other inmates at FCI-Fort Dix, and further reductions in the population would advance the safety of the remaining inmates.").

**C.      Consistency With the § 3553(a) Factors**

Nonetheless, and although defendant's motion is supported by a showing of extraordinary and compelling reasons for his compassionate release, the undersigned is not persuaded that the requested reduction in his sentence would be consistent with consideration of the sentencing factors set forth at 18 U.S.C. § 3553(a).[7] *See Parker*, 461 F. Supp. 3d at 981–83.

In his motion for compassionate release defendant Isho argues that he has served more than five years of his prison term, is nearing the end of his sentence, and has maintained good conduct throughout his imprisonment. (Doc. No. 42 at 20.) Defendant also states that has had no disciplinary history during his years of incarceration and is currently housed at a low-security prison serving a sentence for non-violent drug offenses. (*Id.* at 20–21.) Defendant represents that upon release, he will reside with his parents—who are retired and will be available to ensure that he obeys his conditions of supervised release, including home confinement if imposed as a condition, and support him physically and financially—in Modesto, California for as long as needed. (*Id.* at 21.) Defendant notes that his sister is a correctional officer at the United States Penitentiary in Atwater, California who lives nearby in Merced, California and will assist her parents with defendant's transition back into the community. (*Id.*)

/////

---

[7]  Title 18 U.S.C. § 3553(a) provides that, in determining the sentence to be imposed, the court shall consider:  the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence, protect the public from further crimes of the defendant and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; any pertinent policy statement issued by the Sentencing Commission; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

13

1          In opposition, the government argues that the nature of the defendant's offense
2  demonstrates he is a danger to the community, and that danger is not limited to physical violence.
3  (Doc. No. 44 at 12–14) (citing cases). The government describes defendant's history with law
4  enforcement as follows. Defendant was involved in firearms and drug trafficking, as well as
5  substance abuse, between 2011 and his arrest in 2015. (*Id.* at 12.) Defendant's prior firearm
6  offense conviction occurred in 2014 when he was driving a vehicle and was armed with a stolen
7  semi-automatic pistol while transporting 194 hydrocodone pills and an ounce of
8  methamphetamine. (*Id.* at 12–13.) In connection with his investigation by the Bureau of
9  Alcohol, Tobacco, Firearms and Explosives (ATF) and the Drug Enforcement Administration
10 (DEA) in this case, defendant Isho ultimately negotiated to sell both firearms and drugs to an
11 undercover officer. (*Id.* at 13.) The government argues that defendant Isho has been consistently
12 in contact with the criminal justice system since he was a juvenile, including an arrest for
13 cultivation of marijuana and that he has suffered two prior convictions for sale of marijuana, with
14 each of those offenses committed while he was on probation for a prior criminal conviction. (*Id.*)
15 Lastly, in 2015, defendant unlawfully possessed an assault rifle and fired rounds into the air
16 several times at a funeral he was attending. (*Id.*) The government states that defendant's
17 discipline–free performance while serving his sentence in this case does not reduce the risk he
18 poses to his community and that even if defendant has demonstrated model behavior since his
19 imprisonment on this conviction, that record does not warrant a reduction of his sentence. (*Id.*)
20         In reply, defendant asserts that the government's contention that he presents a danger to
21 the community "is entirely based on the 2013-2014 events that that led to his incarceration (when
22 [he] was in his early twenties), older marijuana offenses, and arrests that never resulted in
23 convictions." (Doc. No. 57 at 15.) Defendant emphasizes the presentence report in this case
24 noted his young age and drug use as factors contributing to his criminal behavior. (*Id.* at 15–16.)
25         As noted above, on May 1, 2017, defendant was sentenced to two 120–month terms of
26 imprisonment in the custody of the BOP, to run concurrent to one another, for the separate
27 offenses of possession of a firearm by a prohibited person and distribution of methamphetamine.
28 (*See* Doc. Nos. 34, 35, 36.) The Presentence Report noted that defendant had suffered two prior

felony convictions for controlled substance offenses and that his conviction for being a prohibited person in possession of a firearm in this case involved a stolen firearm; his separate conviction for distribution of methamphetamine in this case also involved his possession of a stolen firearm related to his drug trafficking offense and that firearm was ultimately sold by defendant to the undercover officer. (Doc. No. 34 at 6–7.) In light of these facts, and with defendant's acceptance of responsibility acknowledged, it was determined that under the U.S. Sentencing Guidelines his total offense level was 34 and his criminal history category was VI. (*Id.* at 7–11.) This resulted in an advisory sentencing guideline range calling for a term of imprisonment of between 262 to 327 months, but because each of the two counts of conviction carried a statutory maximum term of ten and twenty years respectively, the advisory sentencing guideline range for count one was 120 months, and the guideline for count two was 240 months. (*Id.* at 18.) The probation officer recommended a sentence of 120 months imprisonment on each count[8], with the terms to be served concurrently. (*Id.*) The undersigned followed that recommendation and sentenced defendant to a 120-month term of imprisonment on both counts to run concurrently, followed by an aggregate 60-month term of supervised release—36 months on count one and 60 months on count two, to be served concurrently, and $200 in mandatory penalty assessments. (Doc. No. 36.)

As an initial matter, and based on defendant's criminal history as described above, the court finds that consideration of the risk of recidivism on the part of the defendant weighs to some degree against the granting of compassionate release in this case. *See United States v. Magana-Lopez*, No. cr-11-04200-001-TUC-RCC (JR), 2020 WL 3574604, at *2 (D. Ariz. July 1, 2020) (denying compassionate release for a non-violent offender and discounting defendant's contentions that he was at low risk of recidivism in part because he was "serving his sentence after receiving prior drug trafficking").

Moreover, "[t]he length of the sentence remaining is an additional factor to consider in any compassionate release analysis,' with a longer remaining sentence weighing against granting any such motion." *United States v. Shayota*, No. 1:15-cr-00264-LHK-1, 2020 WL 2733993 at *6

---

[8] This recommendation included a substantial downward variance on Count 2 in light of consideration of the sentencing factors set forth at 18 U.S.C. § 3553(a). (Doc. No. 34 at 23.)

15

(N.D. Cal. May 26, 2020) (quoting *United States v. Connell*, No. 18-cr-00281-RS, 2020 WL 2315858, at *6 (N.D. Cal. May 8, 2020)); *see also United States v. Lonich*, No. 1:14-cr-00139-SI-1, 2020 WL 26148743, at *3 (N.D. Cal. May 21, 2020) (denying motions for compassionate release, noting, "the Court finds it significant that defendants have served far less than half of their sentences"). As of the date of this order, defendant Isho has served only approximately 82 months of his 120-month sentence while accounting for his good time credits, or approximately 68 percent of the sentence imposed.

With regards to his post-offense rehabilitation since his sentencing, defendant avers that he has participated as a coordinator in the Alternative to Violence program, a program he contends is shown to considerably reduce recidivism; a nonresidential drug addiction treatment program; anger management class, and several other classes and programs. (Doc. Nos. 57 at 6; 57-10.) Some courts have granted compassionate release where defendants in those cases have participated in similar programs. *See Parker*, 461 F. Supp. 3d at 982 (granting a defendant compassionate release in part because he demonstrated rehabilitation during his imprisonment by earning two associate degrees, participating in other continuing education courses and working as an education instructor, "suicide companion," and career services clerk) (collecting cases). The court acknowledges the efforts on the part of defendant Isho cited above are laudable and will assume that defendant has also participated in the 500–hour BOP Substance Abuse Treatment Program recommended at the time of his sentencing. (Doc. No. 36 at 2.) Nonetheless, even actual rehabilitation alone is not enough to warrant compassionate release. *See* 28 U.S.C. § 994(t); U.S.S.G. § 1B1.13, cmt. n.3.

This is a difficult case. Although the court is sympathetic to the plight of those designated to serve their sentences at FFCI Fort Dix in light of the COVID-19 outbreak occurring at that prison, defendant Isho's offense of conviction is obviously an extremely serious one. Ultimately, the court concludes that a reduction of defendant's ten-year sentence effectively to a term of less than seven years would simply not adequately reflect the seriousness of his offenses of conviction, promote respect for the law, provide just punishment, or afford adequate deterrence to criminal conduct. *See United States v. Purry*, No. 2:14-cr-00332-JAD-VCF, 2020 WL 2773477,

at *2 (D. Nev. May 28, 2020); *Shayota*, 2020 WL 2733993 at *5; 18 U.S.C. § 3553(a); *Collier*, 2020 WL 6682655, at *3 (finding that the 3553(a) factors outweighed the extraordinary and compelling reasons for releasing the defendant from FCI Fort Dix).

### CONCLUSION

Defendant Isho has demonstrated, in the undersigned's view, "extraordinary and compelling" reasons that could justify his release under 18 U.S.C. § 3582(c)(1)(A). However, he has not shown that his release from imprisonment at this time would be consistent with consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a). Accordingly, defendant's motion for compassionate release (Doc. Nos. 37, 42) is denied.

IT IS SO ORDERED.

Dated:   **December 8, 2020**

_____
UNITED STATES DISTRICT JUDGE